## UNITED STATES v. CHEMICAL · FOUNDATION, Inc.

(Circuit Court of Appeals, Third Circuit. March 26, 1925.)

No. 3160.

**1. War ⬤▭12—Sale of enemy-owned patents to the Chemical Foundation, Incorporated, held not pursuant to conspiracy to create monopoly.**

The Chemical Foundation, Incorporated, to which the Alien Property Custodian sold and transferred a large number of enemy-owned chemical patents, trade-marks, and copyrights, *held*, on the evidence, not the result of a combination or conspiracy of the chemical and dye industries of the United States to secure a monopoly, but, on the contrary, a corporation organized at the instance of officers of the United States as a means of effecting the transfer from alien enemy to American ownership of patents of vast importance in the manufacture of war munitions and in the chemical and dye industries, under such restrictions as to permit their free use by the government for war purposes and by such American industries on equal terms and under competitive conditions which precluded a monopoly.

**2. War ⬤▭12—Power of Alien Property Custodian to sell property under amended act, stated.**

Trading with the Enemy Act as originally enacted (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½ff, 3115½g–3115½j) was purely a measure of conservation, the Alien Property Custodian being authorized to sell property seized only when necessary to prevent waste; but by the amendment of section 12 by Act March 28, 1918, § 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), the purpose and scope of the act was broadened, and, on determination by the President that the public interest required it, the Custodian was given power to make any disposition of property seized, "by sale or otherwise * * * in like manner as though he were the absolute owner thereof."

**3. War ⬤▭12—Alien Property Custodian may impose conditions on private sale of enemy property· under amended act.**

Under such change of policy, the powers of the Custodian, which, under the original act were those of a "common-law trustee" for conservation of the property, which required him in case of sale to sell for the best obtainable price, were enlarged, and in a private sale, authorized by the President, the "public interest" was a factor to be considered, and he was authorized to impose conditions in that interest, without regard to the effect on the price obtained.

**4. War ⬤▭12—Sale of enemy property by Custodian held valid.**

Such a sale was not invalid because Congress did not by the amendment expressly confiscate any particular property, but employed the Executive Department as its instrument to determine as a war measure the specific property to which the unrestricted power of sale granted should be applied, and to carry such determination into effect.

**5. War ⬤▭12—Acts done under Trading with the Enemy Act not subject to criminal statutes.**

The assignment of enemy-owned patents by the Alien Property Custodian to the Chemical Foundation, Incorporated, of which he was president, made under the supervision and direction of the President, was not invalid as in violation of Criminal Code, § 41 (Comp. St. § 10205), in view of the provision of Trading with the Enemy Act, § 7 (e), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½d, that "no person shall be held liable in any court for or in respect to anything done or omitted in pursuance of any order, rule, or regulation made by the President under the authority of this act," which renders such section of the Criminal Code inapplicable. Said section also *held* not applicable to the transaction on the facts.

**6. War ⬤▭12—Executive order held to delegate authority to the person named in his official capacity.**

The executive order of December 3, 1918, addressed to the Alien Property Custodian, signed "Woodrow Wilson," without further designation, and providing, "V. I hereby vest in Frank L. Polk all power and authority conferred upon the President by the provisions of section 12 of the said Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff) as amended," must be considered as made by Mr. Wilson officially as President and as conferring authority on Mr. Polk also as an officer of the United States, and not personally; he being at the time Counsellor of the State Department.

**7. War ⬤▭12—Any defect in authority of Alien Property Custodian to sell patents held cured by President's ratification.**

The executive order made by President Wilson February 13, 1920, broadly ratifying and confirming the sale of patents by the Alien Property Custodian to the Chemical Foundation, Incorporated, *held* to cure any defect in the authority under which the sale was made.

**8. Estoppel ⬤▭62(2)—Silence of Congress respecting Executive Acts not ratification.**

Silence of Congress respecting Executive Acts of which it has received a report cannot be construed as an approval or ratification.

**9. Treaties ⬤▭7—Provisions held not to affect rights between signatory and its nationals.**

The provisions of a treaty do not affect rights as between a signatory and its own nationals.

**10. War ⬤▭12—President authorized to delegate powers given by Trading with the Enemy Act.**

Under the provision of Trading with the Enemy Act, § 5 (a), being Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½c, that "the President may exercise any power or authority conferred by this act through such officer or officers as he shall direct," he had power to delegate to another officer of the

United States authority to determine when, under section 12 (section 3115½ff), as amended, seized enemy property should, in the public interest, be disposed of otherwise than at public sale. (Buffington, Circuit Judge, dissenting.)

**11. War ⚖=12—Price received for German chemical patents sold by Alien Property Custodian held not inadequate.**

On the seizure of enemy property under Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½ff, 3115½g–3115½j), the title of the enemy owners was divested and the legal or equitable title became vested in the United States. Hence, in determining the value of German patents so seized and sold, the question is, not their value to the German owners, but to the United States, which is affected by the provision of the act that sales of property should only be made to American citizens, to whom the patents would in many cases be of much less value than to their former owners, and also by conditions lawfully imposed in the sales. In view of such considerations, the price of $250,000 received for the German chemical patents sold and assigned to the Chemical Foundation, Incorporated, subject to the conditions that the United States should have free licenses thereunder and that American citizens should be entitled to nonexclusive licenses on fair and equal terms, which conditions precluded any monopoly thereunder, was not inadequate.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Suit in equity by the United States against the Chemical Foundation, Inc. Decree for defendant, and the United States appeals. Affirmed.

For opinion below, see 294 F. 300.

Harlan F. Stone, Atty. Gen., James M. Beck, Sol. Gen., of Washington, D. C., James H. Hughes, Jr., U. S. Atty., of Wilmington, Del., Herman J. Galloway, Sp. Asst. U. S. Atty., of Washington, D. C., and Henry W. Anderson, Sp. Asst. U. S. Atty., of Richmond, Va. (Spier Whitaker, of New York City, and James J. Lenihan, of Washington, D. C., of counsel), for the United States.

Joseph H. Choate, Jr., of New York City, William G. Mahaffy, of Wilmington, Del., Seiforde M. Stellwagen, of Washington, D. C., and Moorfield Storey, of Boston, Mass., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. This suit was instituted by the United States of America against The Chemical Foundation, Incorporated, by direction of President Harding, on a bill in equity filed September 8, 1922, in the District Court of the United States for the District of Delaware. The Government in its bill declares upon the Act of Congress approved October 6, 1917 (40 Stat. 411 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115½a–3115½ff, 3115½g–3115½j]), known as the "Trading with the Enemy Act," and its several amendments, particularly those of March 28, 1918 (40 Stat. 460 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff]), and November 4, 1918 (40 Stat. 1020 [Comp. St. Ann. Supp. 1919, § 3115½d]), creating the office of Alien Property Custodian and authorizing the seizure of property of enemy aliens and its disposition at public sale, or at private sale if the President, in the public interest, should so determine. The Government charges by the bill that certain persons and corporations engaged in the dye and chemical industry desired to acquire the great number of American patents, copyrights and trademarks owned by German enemies and thereby obtain a monopoly of the dye industry of the United States, and that, pursuant to a scheme or conspiracy into which they entered, the Alien Property Custodian seized approximately 4,500 of such patents and many copyrights and trade-marks and sold them at private sale to The Chemical Foundation, a corporation of which he was an officer and whose stock was held by the persons and concerns that had instigated the seizure and sale. It avers that in making the sale the Custodian exceeded all powers conferred upon him by the statute; that his act was in effect a confiscation of property by one other than Congress where alone such power resides, and that the transfer of the patents to the corporation was a donation or subsidy given to a private industry without authority of law; that the Custodian, a public official, in selling the patents to a corporation of which he was an officer and in which he had an interest, violated principles of equity applicable to sales by fiduciaries, whether public or private, and that he, with others, violated section 41 of the Criminal Code (Comp. St. § 10205); that if the Custodian was authorized by the statute to sell siezed property at private sale, in this transaction he lacked the authority of the President of the United States, who alone might determine when in the public interest a sale otherwise than public should be made; and that, aside from questions of power and authority and fidelity, the sale was irregular in many particulars, especially in that the price was merely nominal, that it was arbitrarily fixed without reference to value, and was grossly inadequate. Maintaining that

for these reasons the sale and assignments of patents, copyrights and trade-marks were illegal, the government by its bill prays that the court declare them void and require The Chemical Foundation to cancel all instruments of conveyance and return the properties to the United States and account for the revenues derived from them during the period of its possession.

The defendant, by its answer, traversed most of the allegations of the bill and made several specific defenses, namely: Want of equity, because of which it moved to dismiss the bill; laches and acquiescence on the part of the Government; and justification of the sale on the ground that it was made to promote the interests of the dye and chemical industry of the United States and thereby to establish a national defense in chemical warfare. The Government moved to strike out parts of the answer and particularly the part on which the defense of justification was set up. The court declined to entertain either motion at that stage and directed the parties to proceed to trial.

The case came on for hearing before the District Court on June 4, 1923, and ended on the twenty-third of July, with a record of 9,000 pages. It was argued in October of the same year. On an opinion by the trial judge, filed January 3, 1924, holding adversely to all contentions of the Government, the court, on February 18, 1924, entered a decree dismissing the bill. 294 F 300. The case is here on the Government's appeal. This is a summary of the litigation.

[1] We now come to the story of the case, for every case has a story. This case, however, has two: One told by the evidence as the attorneys for the Government read it and the other told by the evidence as we read it. Believing that the contrast will bring the issues sharply into view, we shall give both. In reciting the Government's story we shall (in our desire to state its case on the facts precisely as it sees it) use the words of its brief as nearly as we can and the words of the transcribed stenographic notes of the oral argument made by the Special Assistant to the Attorney General, upon whom devolved the opening on this appeal. Greatly compressed, it is as follows:

On January 13, 1919, A. Mitchell Palmer, the Alien Property Custodian, held a conference with his heads of departments with reference to a discussion between himself and the Federal Trade Commission having to do with issuing licenses under German patents upon authority of the Trading with the Enemy Act. As a result of that confer-

ence Mr. Palmer filed with the department a memorandum showing his interpretation of the amendment in respect to the seizure and sale of enemy-owned patents and laid down the general policy that the Custodian would seize and sell only such patents, as form an actual part of an enemy-owned business and which, accordingly, are necessary to enable the purchaser to carry on the business protected by the patents. Two days later, January 15, 1919, Mr. Houget, patent counsel for the Custodian, wrote a long letter to his chief. That letter is the genesis of the transactions out of which this suit arises. Referring to certain extracts of the letter, Mr. Houget states:

"We have also talked over the matter with the attorneys representing some of the principal chemical industries in the country to get, if possible, the bulk of an industry which would be vitally effective by our proposed program."

"My recollection of your agreement with General Fort (Chairman of the Federal Trade Commission) is that we then had no intention of demanding and selling any patents except such as formed an actual part of the business which we had demanded and were selling so as to enable the business to continue what it had previously been doing with the assent and concurrence of the related German company."

"In view of this agreement, and of the attitude of the President towards this entire question, I believe that the power of seizure of patents should not be exercised in any wholesale fashion, but only in connection with establishing American businesses and then only for the most cogent reasons."

"My conferences with the representatives of certain chemical companies indicates a very definite and positive feeling that a very large number of German-owned American patents is necessary to the development of and the continuance of the business of American dye and chemical industries, and that it was clearly preferable to obtain a right to offer it under such patents (whether by purchase or by license), through the Alien Property Custodian rather than through the Federal Trade Commission."

"This being the feeling of the industry and our endeavor being to benefit the industry as a whole—and I believe that the industry itself is best qualified to know how this should be done—I suggest that wherever possible the industry, as represented by the patent counsel for the more important companies of the industry, determine just what patents should be seized. You could then not be accused of

seizing patents in wholesale fashion but would be placed in a position of aiding an industry in a manner which it desires to be aided and I think that our position would be better than if we determined ourselves to what extent seizures were to be made."

"We have been offered the very fullest cooperation of the representatives of the chemical industry; they assured me that they would undertake to make any reasonable investigation that we may · require at their own expense without any guaranty that they would ultimately become purchasers or licensees."

In a postscript he says:

"Since writing the aforegoing Mr. Garvan (Chief of the Bureau of Investigations) and I had a conference with Mr. Poucher of the Du Pont Company, who states that he believes that the Institute of Dye Manufacturers, an association representing practically all of the dye manufacturers in the country, will make a request to the Custodian that he take and sell the German-owned American patents, on the ground that proper protection is not afforded by Federal Trade Commission licenses."

Having stated what the Government represents to be the initial move by Government officials in the offending transaction, , we shall do as counsel did at the argument and digress for a moment to give the background of this letter and of the events that followed.

At the time the war broke out the dye and chemical industries in the United States were comparatively small, and a large proportion of their important products was imported from Germany. When the English blockade was established and dye and chemical importations were cut off, there was, as will be remembered, a large and insistent demand for such dyestuffs and chemicals by the American public. In consequence a good deal of embarrassment was caused textile and chemical manufacturers. As a result there almost immediately developed in the United States extensive dye and chemical manufactories. · The business grew very rapidly. It increased so immensely during our own period of the war that, before the end, the manufacturers in the United States were not only producing the leading chemical and medical products like salvarsan, neo-salvarsan and novacaine in quantities greater than were needed in this country and better than Germany had produced, but they were in fact producing ninety per cent. of the dyestuff requirements of the textile and other industries of the United States under about sixty

groups of licenses of enemy-owned patents granted by the Federal Trade Commission, running for the life of the patents subject to certain postwar adjustments.

It was obvious long before the war closed that, not unnaturally, the dye and chemical manufacturers of the United States should consider what would take place after the war. They were not willing to take the risk of the policy which Congress might adopt on the return of peace and of legislation which might be enacted either as to the disposition of the patents or the protection of the industry. They determined to take measures for their own protection. Accordingly, in July, 1918, they made efforts to induce the Government to establish a licensing system restrictive of importation similar to that employed in England and to impose high tariff duties.

In December, 1918, and January, 1919, after the armistice, the manufacturers became very active. Corporations like the General Chemical Company and the National Aniline Company were consolidated into larger corporations. These corporations then organized themselves into two bodies, one the Dye Manufacturers' Association and the other the American Dyes Institute, unincorporated trade associations, subsequently consolidated into the American Dyes Institute, whose membership embraced concerns manufacturing ninety per cent. of the dyestuffs produced in the United States. Mr. Poucher, the head of the dye department of the Du Pont Company, was chairman of the Executive Committee of this association.

Returning to the letter of Mr. Houget of January 15, 1919, the starting point in the Government's case, it appears that from that time there were numerous conferences between representatives of the dye and chemical industries and members of the staff of the Alien Property Custodian.

The principal organization of the Alien Property Custodian was in Washington, but he maintained in New York an office in which there was the Bureau of Investigations, having in hand the investigation of conditions leading up to seizures of enemy-owned property. Mr. Francis P. Garvan was chief of this bureau, Mr. Joseph H. Choate, Jr., was attached to it in charge of the investigation of the chemical and dye business, and Mr. Ramsay Houget was patent counsel of the Custodian. In the conferences to which Mr. Houget refers in his letter all these gentlemen participated. As the industries had determined to acquire control of the German patents through the Custo-

dian, proceedings to that end were rapidly developed in view of the anticipated early signature to a treaty of peace which might interfere with it. So the representatives of the industries and the New York members of the Custodian's staff arranged a formal conference to be held in Washington on January 27, 1919. At that conference Mr. Mansfield Ferry, general counsel for the Custodian, Mr. Hahn, another counsel, Mr. Choate and Mr. Houget representing the Custodian were present. Mr. Palmer and Mr. Garvan were absent. On the other side there were representatives of the American Dyes Institute, the National Aniline Company and E. I. du Pont de Nemours & Company. A plan, conceived by Mr. Garvan, for the purchase at private sale of the German dye patents by a corporation to be organized by the Dyes Institute was submitted. In this plan it was the part of the Custodian to obtain permission of the President for a private sale of the patents, the number of which was not known but it was guessed there would be between 1,000 and 3,000. The value of the patents was not discussed, but it was suggested that, as it cost about $50 to acquire a patent, the price should be based on that cost. Mr. Houget named the figure of $250,000. However, the conference adjourned with an understanding that the Custodian should proceed at once with the seizure of the patents and the price would be determined later. This was the twenty-seventh day of January, 1919.

Returning to New York, the representatives of the Dyes Institute promptly called a meeting of the Executive Committee which approved the appraisal and agreed to underwrite the cost of listing the patents and arranged that patent attorneys of the National Aniline Company and the Du Pont Company should be placed in the Patent Office at Washington to do the work.

The plan for the seizure proceeded, beginning early in February, 1919. Lists of the patents intended to be seized were made by attorneys for the industries and the titles to the patents were abstracted by attorneys for the Custodian. In the meantime numerous conferences were held between representatives of the Custodian and representatives of the industries at which the scheme was further developed and the price of $250,000 was finally agreed upon, although the number of patents to be sold was yet unknown and no steps had been taken to ascertain their value. Moreover, the terms of the sale were framed so as to exclude all competitive bidding. Members of the Dyes Insti-

tute representing nearly all of the dye producers of the country agreed to underwrite the entire capital stock of the proposed purchasing corporation. This accomplished, the Custodian, on February 21, 1919, signed a formal demand for a number of the listed patents and presented it to the Commissioner of Patents. This constituted a seizure. By like demands seizures of other patents were made on March 4 and April 9.

Mr. Garvan, still Chief of the Bureau of Investigations, then appeared before the Sales Committee of the Custodian and submitted the plan to it. This committee was established by Mr. Palmer when, as Custodian, he was given power to sell enemy-owned property. It was in fact a sales organization, established with the knowledge and approval of President Wilson, with power to make regulations for the guidance of the Custodian and to approve his transactions of sale. This committee consisted of Mr. Otto G. Bannard, Mr. George D. Ingraham, Mr. Stone and two others, men of standing in the business and of wide knowledge and high character. They had power to pass upon all sales with special reference to the purchasers, the adequacy of the consideration and as to their general propriety. The plan was submitted to this committee before the patents had been seized, the price fixed, or the corporation organized. The committee approved it. Further, the members of the committee consented to act as voting trustees of the stock of the proposed purchasing corporation. At another conference between representatives of the industry and Mr. Choate, Mr. Houget and Mr. Garvan, it was agreed that Mr. Garvan, then Chief of the Bureau of Investigations, should become President of the corporation, that Mr. Choate should obtain its charter (for which service later he received a substantial fee) and that he should be its general counsel, and that Mr. Houget should be its patent counsel (in which position later he received very large fees).

On February 19, 1919, the charter of the corporation, known as The Chemical Foundation, Incorporated, now the defendant in this suit, was filed in Delaware with nominal incorporators, that is, local people and clerks in the office. The corporation was organized on March 3, 1919, when the informal incorporators subscribed to the minimum capital stock and transferred their subscription rights to Mr. Garvan, Mr. McKay and Mr. Corbitt, who were elected directors of the corporation in their places. The remaining shares were subscribed by chemical manufacturers interested in the patents at the rate

of two shares of common stock each with varying amounts of the preferred stock. The first meeting of the directors was held on March 8, 1919. Up to this time Mr. Palmer, the Alien Property Custodian, does not appear on the record at all. He testified, however, that he discussed this matter constantly with Mr. Garvan and that all the proceedings had his approval.

On February 26, 1919, Mr. Palmer appeared for the first time in the transaction and he appeared then because up to this point the necessary authority for the Custodian to dispose of the patents to the proposed corporation at private sale had not been obtained from the President. By an order of December 3, 1918, the President, before going abroad, vested in Frank L. Polk, then Counsellor of the State Department, the power which section 12 of the Act, as amended (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff), gave the President to determine when in the public interest a private sale should be made. The executive order did not purport to vest this authority in the official or in the office but in Mr. Polk personally. The President returned from Europe on February 25, 1919. On the next morning Mr. Palmer addressed a communication to Mr. Polk enclosing an executive order for him to sign, authorizing the private sale of the patents. Mr. Polk, though in ignorance of the whole matter, signed the order. On March 4, 1919, Mr. Palmer resigned as Alien Property Custodian and on March 5 became Attorney General of the United States. On the day of his resignation, the President, on Mr. Palmer's recommendation, appointed Mr. Garvan Alien Property Custodian. On March 8, pursuant to the previous arrangement, Mr. Garvan became president of The Chemical Foundation and from that date was both president of the corporation purchasing the patents and Alien Property Custodian making the sale, and in these wholly opposite official positions determined the price which should be paid by one of his principals and received by the other. Moreover, Mr. Choate, counsel in chief of the Chemical Division of the Bureau of Investigations, became general counsel for the purchasing corporation, and Mr. Houget, patent counsel for the Custodian, became patent counsel for the corporation, and the five members of the Advisory Sales Committee, who, acting for the Government, had passed on the sale, became the voting trustees of the stock of the corporation.

Early in April seizure of the remainder of the listed patents was made and on April 10, in completion of the unlawful scheme or conspiracy, approximately 4,700 patents and a large number of copyrights and trademarks, amounting to more than 6,000 in all, were formally assigned to The Chemical Foundation for the consideration of $250,000, and this in face of the known fact that during the previous year licenses of a relatively small number of the same patents granted by the Federal Trade Commission had yielded a revenue of $300,000 and of the fact generally known that some of the patents assigned were worth many million dollars. This, briefly, is the Government's story.

With entire respect for the way in which the eminent counsel for the Government read the record, we are constrained to say that the evidence reveals to us a very different transaction—different in origin, purpose, conduct and achievement. Much of the evidence, and particularly that which concerns the negotiations of sale and the naming of terms, is not disputed. The controversy centers mainly on the inferences properly to be drawn.

Before stating the case as it appears to us it will be necessary to give the background against which stand out the acts and motives of the men in the transaction. In order to do this we must advance a step further in our examination of the Trading with the Enemy Act. This Act, as we have said, was approved October 6, 1917, six months after the United States had entered the war. As originally enacted it provided, among other things, for the seizure and administration of "enemy-owned" money and property in the United States. To this end it defined the word "enemy" (section 2 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½aa]); authorized the President to exercise "any power or authority conferred by this Act through such officer or officers as he shall direct" (section 5a [section 3115½c]); created the office and provided for the appointment by the President of the Alien Property Custodian (section 6 [section 3115½cc]); required all persons in the United States to report to the Alien Property Custodian enemy-owned property in their custody (section 7a [section 3115½d]); provided for the seizure of enemy-owned property by authorizing the President to require the payment and delivery thereof to the Alien Property Custodian (section 7e); prescribed methods by which anyone not an enemy or ally of enemy might recover property mistakenly seized (section 9 [section 3115½e]); gave authority to the President

to grant licenses under enemy-owned patents to citizens of the United States, later exercised by him through the Federal Trade Commission (section 10 [section 3115½ee]); authorized the administration of seized property by the Alien Property Custodian under presidential supervision; and postponed until after the war settlement of any claim made by an enemy to seized property (section 12).

While this law authorized the President in his discretion to take over enemy property, it constituted the Alien Property Custodian a mere custodian or conservator thereof, permitting him, under presidential supervision, merely to hold, preserve and manage it as a "common law trustee," and to dispose of it by sale only "when necessary to prevent waste, and to the end that the interests of the United States in such property and rights, or of such person as may ultimately become entitled thereto, or to the proceeds thereof, may be preserved and safeguarded."

It is clear that the law as originally enacted was purely one of conservation. In consonance with its policy, Mr. A. Mitchell Palmer, who had been appointed Alien Property Custodian, issued an official statement assuring the public that enemy-owned property would be carefully preserved.

When the law was enacted and this announcement made there was little knowledge of German investments in the United States. They were known to be large but they were not suspected as being hostile to American interests. But this idea was quickly dispelled. Responding to the mandate of the Act, persons and corporations in the United States having enemy-owned property in their custody made 35,000 reports of such property to the Custodian. These reports showed property of more than $500,000,000 in value, extending into every state in the Union and the territories and insular possessions, affecting every industry and monopolizing some. It was the Custodian's duty under the statute to take over and operate this huge aggregation of property and it at once became apparent that he was earning large profits as manager of enemy-owned businesses. Many of these were engaged in the manufacture of articles necessary for the war. Enemy-owned textile mills were profitably manufacturing army uniforms, and enemy-owned machine shops were profitably turning out ordnance. The ultimate outcome seemed plain. If, after the war, enemy-owned property and its earnings were to be returned to enemy-owners, they would reap huge war profits which the Custodian had made for them.

It was also quickly revealed that all enemy-owned property was not property of casual private German investors but, on the contrary, was in large part owned by the Junker class and no inconsiderable part was owned by the Royal Family and by the Kaiser himself. It also developed almost at once that a large portion of the property had definite hostile effects upon the interests of the United States. These are examples:

The Orenstein Arthur-Koppel Co., a great German firm engaged in the business of installing inside railways in industrial plants, had for twenty years been competing for plant equipment all over the country on plans and specifications which were forwarded to their office in Berlin and thence to the German Government.

A number of German-owned fire insurance companies had accumulated plans of industrial plants which likewise were forwarded to their home offices and thence to the proper German bureaus.

The Bosch Magneto Company manufactured special apparatus for aeroplanes. Before the entrance of the United States into the war it had made contracts (in some instances through American concerns) to supply such appliances to the Allies. In complicity with Privy Councillor Albert, the German financial representative in the United States during the early period of the war, it succeeded by a policy of deception and delay in postponing deliveries for fifteen months.

Employees of the Hamburg-American Line and the Nord-Deutsche Lloyd, German-owned steamship lines, kept close watch on the maritime business of the United States, and reported to the German Government every ship and its cargo leaving these shores.

The Florida Lumber Company had acquired every advantageous place on the finest harbor in the Gulf of Mexico, the nearest harbor on American soil to the Panama Canal. Its files instead of containing matters pertaining to the lumber business were filed with Pan-German literature. The lumber plant was a distributing center of propaganda.

Other concerns cornered the market in coal tar products that were convertible into explosives in order to hamper the manufacture of munitions. Their achievements in acquiring essential chemicals were regarded by the German authorities as equivalent to the destruction of a train of four hundred cars loaded with explosives.

Among the industries in this country which the Custodian discovered were completely owned by German enemies was the chemical industry dealing principally in medicinals and dyestuffs. As this industry is the center of the controversy here in suit we must pause still further to inquire into its character and its relation to the United States.

The character, operations and magnitude of the German chemical industry prior to the war and during the war and the size and position of the American chemical industry during the same period appear in the record at great length and are admirably condensed in the chapter on the chemical industry prepared by Mr. Choate and contained in Mr. Palmer's report to the President of February 15, 1919, and transmitted by the President to Congress on March 1, following. Though vitally pertinent to the questions here involved we shall be able to sketch only in the barest outline this mass of facts.

Before the war the manufacture of heavy chemicals, such as sulphuric acid and nitric acid, was well developed in this country. These products, being of relatively simple composition, were easily made; and being cheap to produce and expensive to transport, they were profitably manufactured in any given locality. Due to cheap electric power the electro-chemical industry was also well developed. For well-known reasons the oil industry had attained full growth. But in the great field of organic chemistry the United States was entirely dependent upon the Germans, who had a world monopoly.

This position of the United States was due to a variety of circumstances: The Germans had started early in the industry and had made amazing strides; they had formed great trusts, or kartels, with the approval of their government, and with government aid they were able to enter our markets and destroy or thwart such feeble competition as from time to time arose or struggled on. By practices of "full line forcing," foremen bribery and "dumping" they consolidated their control. But, more important than all, they applied for and obtained several thousand American patents which it was supposed blanketed the art of organic chemistry and the essentially related art of by-product coke ovens in this country.

Organic chemistry is the chemistry of carbon and its compounds. Carbon differs from other elements in that instead of combining with a few other elements in a few definite proportions it will combine with numerous other elements in almost unlimited proportions. The result of this extraordinary facil-

ity of combination is that the chemistry of carbon involves a study and production of a multitude of totally diverse products. The importance of this branch of science is due chiefly to the fact that organic chemistry is the chemistry of life. Almost all the chemical substances found in living bodies are organic products, and at one time it was supposed they could be produced only by some action of the principle of life. But about the middle of the last century urea, one of the most well-known organic compounds, was produced synthetically out of coal tar. From this it was conceived that every compound which enters into the body structure can be reproduced synthetically by processes of organic chemistry. Next grew the thought that all diseases are the result of poisons produced in the system, usually by germs, and these being susceptible of identification may be neutralized or destroyed by appropriate chemical compounds. For example, salvarsan, an organic chemical product originally made in one of the great German dyeworks, is a synthetic product which definitely and positively neutralizes the poison of syphilis.

It happens that the only industry that calls into play resources of this kind is the dye industry. Its base is coal tar and its output is a most extraordinary variety of products. The dyemaker starts with ten well-known "crudes"—toluol, benzol, phenol, cresol, and others—found in coal tar and nowhere else, and converts them by given processes into about three hundred complex compounds appropriately named "intermediates," and by variations of processes these are converted into other intermediates, and these into still others, and so on indefinitely until, finally, innumerable finished products consisting of perfumes, photographic chemicals, tanning materials, medicinals and dyes of many thousand colors are produced. Thus it will be seen that the chemical industry is probably the most complex industry calling for unusual qualities in the men who direct and partake of its activities.

Intermediates being unfinished products (as the name denotes) are of no particular use in themselves and have no commercial value except when sold to other chemical producers for further treatment. But they are of the highest importance in the industry because slight variations in their development make great differences in the finished products. Therefore it is in the proper handling of such sensitive compounds that the genius of the inventor and the skill of the operator are most severely tested.

"But if organic chemistry is the science of life, it is also the science of death." Everyone of the great explosives and every one of the great modern war gases is an organic product. Their base is coal tar, a by-product obtained in the modern manufacture of coke. Otto Coking Co. v. Koppers Co., 258 F. 122, 169 C. C. A. 208. It is now realized that the striking power of a nation is in proportion to its supply of coke by-products. Germany's initial strategy in the war was based in part on this fact as was evidenced by its first act of seizing Belgium and Northern France where there were more by-product coke resources (outside of its own) than in all of Europe. These, when combined with its own, gave Germany control of coke by-products vastly greater than were to be found in all the rest of the world.

Coal tar, as we have said, is the base of the dye industry, and finished explosive products are obtained by slight variations in the intermediates produced in the development of dyes. For example, trinitrotoluol (T. N. T.)—picric acid and tetryl—is produced by the ordinary dye process, in dye apparatus, by dye workmen, from toluol, a coal tar crude. The intermediate from which it is produced (P. N. T.) was for many years a dead product, but the Germans discovered that it could be made into T. N. T. Picric acid is itself a useful dye; and in the long process of manufacturing sulphur black, the most largely used dye (except indigo), a slight variation of the final step will turn the product, at will, into either the black coloring matter or the high explosive.

The war value of the organic chemical industry is even more apparent in the field of poison gases. The war just ended was mainly a chemical war. In the last of the fighting more than half of the shells fired contained gases. It is fair to assume that, even if no further advances are made in chemistry, the next war will begin where the last left off.

As in the case of explosives, poison gases are the product of the materials, apparatus, processes and technique found in dyeworks and nowhere else. It is equally true that protective defenses against gas attacks, such as the chemicals used in gas masks, have been discovered and developed in dyeworks. Hence, dyeworks in times of peace are potential munition plants maintained and equipped to become, in the event of war, actual munition plants on almost a day's notice. Germany demonstrated that munition plants based on an organic chemical industry can be effectively created and maintained in no other way. Having no such industry when it entered the war, the United States built the Edgewood Arsenal at a cost of $35,000,000. Though a colossal plant, it is valueless unless vast sums are annually spent, not in maintaining the structure, but in producing organic chemicals and keeping chemists, workmen, foremen and technicians constantly trained that they may know how to carry on the manufacture of munitions when the demands of war come. It was therefore evident to the officials of the national government that a dye industry is a national bulwark in chemical warfare and that in the United States it had become an imperious necessity.

The chemical industry is also one of great importance in times of peace. It is a key-industry. Its products are essential to the woolen and cotton textile industries, to the photographic and phonographic arts, to the manufacture of paper, ink, leather, and a vast number of other products, amounting in the United States to between $2,000,000,000 and $3,000,000,000 annually. Such a position in commerce carries with it corresponding power, as was demonstrated before our country entered the war when Germany (holding the key) exercised its power by trying to force the United States to cause the British Government to raise the blockade in consideration of a supply of dyestuffs and medicinals to meet the public demand in this country. The President, however, firmly resisted the pressure at home and the insistence abroad.

We shall not repeat the evidence disclosing the power of the German kartels as it affected the United States during the early months of the war further than to show the belief expressed by the German Ambassador at Washington in a cablegram to Berlin, "That the stock of dyes in this country is so small that by a German embargo about four million American workmen might be thrown out of employment;" and to quote a reference to the situation made by the German Consul General, Hossenfelder, in a report to his government: "I may, however, mention that the cry for help which comes from the world of physicians is becoming louder and louder and more and more insistent." Nor shall we review the trade practices employed by the German kartels in selling their products in the American market. Though relevant, such matters are secondary to the main consideration of the national defense.

We have made this digression on the subject of organic chemistry because of our conviction that no one can have even an ap-

proximate understanding of the case at bar without some knowledge and appreciation of the conditions of modern warfare and the ability of the United States to meet them.

Returning to the actors in this case, it was apparent to Mr. Palmer, the Alien Property Custodian, as time went on, that the mere powers of conservation of enemy-owned property conferred upon him by the Act of October 6, 1917, were wholly inadequate to meet the situation. He laid the problems of his office before committees of Congress and showed them the necessity of going a step beyond conservation and advancing to the sale of seized property. So, Congress, by the Amendment of March 28, 1918, repealed section 12 of the Act and substituted another section which, beginning with the same words, vested in the Custodian "all of the powers of a common law trustee in respect of all property" that he shall seize, and "in addition thereto" gave him power "to make any disposition [of such seized property] by sale or otherwise. * * *" Continuing, the section, however, placed limitations upon this power, which are "That any property sold under this Act, except when sold to the United States, shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement, * * * unless the President stating the reasons therefor, in the public interest shall otherwise determine." Under this power, Mr. Palmer sold many seized properties. Before long, however, he discovered that a number of enemy-owned businesses were conducted under enemy-owned patents, and that, consequently, to sell the physical assets without the appurtenant patent rights meant to give the purchaser not a business but a lifeless plant. To remedy this situation he had to have authority to sell patents as well as physical property. Being in doubt as to his power to do this, he asked for an opinion by the Attorney General who replied that the Act, as it stood, did not confer power to seize and sell patents. To overcome that difficulty an amendment to section 7c of the Act was drafted and proposed to Congress by Mr. Palmer and, on November 4, 1918, Congress amended the Act by authorizing the seizure of "patents, copyrights, applications therefor, * * * trade-marks, choses in action, and rights and claims of every character and description owing or belonging to * * * an enemy or ally of enemy." (40 Stat. 1020.)

The first important exercise of the power conferred by the last amendment arose in respect to the sale of Bayer & Company,

Inc. This company represented, as sales agent, the giant concern of Bayer Company of Leverkusen, and had established a considerable manufactory in the United States. To evade taxation by concealment of profits another company had been organized known as Synthetic Patents Company, Inc., all of the stock of which, like that of the Bayer Company, was held by the German parent concern and to which all the American patents of the German house were conveyed. These, about 1,200 in number, were dye and chemical patents.

On December 12, 1918, the Alien Property Custodian sold the property of the Bayer Company and the Synthetic Patents Company, including the patents, at public auction to the Sterling Products Company of West Virginia, the highest bidder.

The Sterling Products Company was not known to the Custodian prior to the sale. The German names of some of its officers arousing suspicion, an inquiry was made into the concern. There was the possibility that the plant had been sold to Germans or to men with German connections, though later this was found to be incorrect. Mr. Palmer realized that he had sold to a private corporation a large group of patents with unrestricted patent monopolies; that there was no assurance that the patents might not be reconveyed to the Germans after the war; that the purchaser enjoyed a monopoly of these patents and that thereby if any considerable number of patents were bought by the same concern a monopoly of Americans might be substituted for that of Germans.

These possibilities were portentious, and it was then that Mr. Palmer (not Mr. Garvan, as the Government maintains) conceived the idea of so disposing of the German patents as to create an American chemical industry.

Shortly after the Bayer sale Mr. Palmer, still alarmed at the possibilities which that sale suggested and believing that something should be done to prevent them from becoming actualities, sent for Mr. Garvan, Mr. Choate and Mr. Houget and laid before them in a general way the ideas which that sale had prompted and requested that they go home, think them over and bring back a perfected plan for his consideration. Testifying as to that interview Mr. Palmer said:

"The information that I had received had impressed me with the importance of several things in relation to this chemical patent business, all of which were factors in the working out of the problem. The tremendous development of the chemical

science and industry for war purposes, as the war had demonstrated, made the chief and largest impression upon my mind. The absolute necessity, as demonstrated by Germany, of having a war industry in this country, I mean having a chemical industry in this country, if we were going to be adequately prepared for the kind of wars the last war showed the next war to be, led me to declare that we must work out some plan by which this German grip upon the chemical industry, so far as it applied to America, must be transferred to a new American industry under such conditions as would safeguard the government in the use of every product of the chemical industry which it might require for its own safety and protection in the future; that it ought to be built up and developed in such a way that the Government could constantly have the benefit of it.

"That was the one broad phase of the plan that I laid down to these gentlemen. The other was, and it was not my own entirely, but largely the result of the Federal Trade Commission's views and of what I knew to be the general policy of the administration, that in the building up of that industry a plan had to be worked out by which it should be a competitive industry and no monopoly should result from it.

"Now, these were the two big ideas. It was all nebulous in my mind. It was very general and very broad. The purpose was plain. We wanted to build up an American industry in order that the Government and the people should benefit from it. We wanted to do it in a way that would make that absolutely certain forever and in a way that would not result in monopoly. Now, with that broad and general plan these men went out and tried to work out the plan."

Mr. Palmer was corroborated by the testimony of Mr. Garvan, who said:

"He (Mr. Palmer) told us to go off and work out something and come back and report."

Mr. Choate testified:

"I never heard a suggestion of it from outside until after it had been very completely discussed inside the office."

It is pertinent to note that when on the stand Mr. Palmer was not cross-examined, nor was his testimony contradicted. We therefore find that the plan to seize and sell German patents was not instigated by representatives of the industry and that its genesis was not the letter written by Mr. Houget to Mr. Palmer, bearing the date of January 15, 1919, as the Government maintains, but that it had its birth in the mind of Mr. Palmer in the month preceding.

Mr. Garvan, Mr. Choate and Mr. Houget returned to New York and in obedience to the direction of their chief set about formulating a plan. They conferred with members of the American Dyes Institute and the Manufacturing Chemists' Association. As a business proposition the idea of purchasing the patents with non-exclusive rights made no appeal to the members of the industry but they indicated a willingness to participate in some such plan as a matter of public interest. These representatives of the Custodian had many conferences with the Executive Committee of the Dyes Institute and the Executive Committee of the Manufacturing Chemists' Association, of which Mr. Palmer was regularly informed. He refused to adopt certain proposals, agreed to others, and supplemented those agreed upon by naming conditions and requirements which occurred to him as necessary to insure the purpose he had in mind. Finally, a conference to be held in Washington was arranged, which was the one previously referred to as of January 27, 1919, when representatives of the industry and of the Custodian were present. At that meeting a plan was proposed and agreed to. The terms and conditions of the plan were in the main dictated and in the whole decided by Mr. Palmer. Therefore, we find that the terms of the plan which ultimately resulted in the sale of the patents were not imposed by the industry but were laid down by Mr. Palmer representing the Government. They were in substance these:

That a corporation should be organized to purchase all the organic chemical and related enemy-owned patents; that its stock should be available for subscription to any member of the industry; that its stock whether common or preferred, should be entitled to not more than six per cent. dividends per annum, and that the surplus, if any, should first be used to redeem the preferred stock and then for the advancement and development of chemical science in the United States; that the corporation should be obligated to issue non-exclusive licenses under all its patents to all qualified American manufacturers, upon fair and equal terms regardless of whether the applicant for a license was a stockholder or not; that the corporation's duty should be to hold the patents in trust for American industry and to protect them against infringers; that all the stock of the corporation should be trusteed for seventeen years, that is, as long as

the possible life of the patents to be sold; that the trustees who should have plenary powers over the affairs of the corporation, including the election of its officers, should be appointed by Mr. Palmer and thereafter be self-perpetuating; and that the Government should have free non-exclusive licenses for all governmental purposes under all the patents.

At this conference, as previously stated, the price of the patents was not agreed upon, although, contrary to the statement of the Government that "no effort whatever was made to ascertain the value of the property," the subject was carefully considered and all realized the practical impossibility of determining their value with any degree of approximation. Later, Mr. Palmer in dealing with members of the industry strove to obtain the highest obtainable price, but it appeared that under the required conditions and especially under the one which provided for the issuance of nonexclusive licenses, the most that the industry could raise was $500,000. It was thought that at least half of that amount would be required for working capital of the new corporation, involving inevitably the expenditure of substantial sums in patent litigation. That left $250,000 available as a cash consideration to be paid for the patents. The propriety of that sum was seriously considered and discussed and it was finally agreed upon. It should be noted here that at this time Mr. Palmer, not Mr. Garvan, was Alien Property Custodian, and also that, as of February 15, 1919, Mr. Palmer, the Alien Property Custodian, made full report of the proposed sale and its terms to the President of the United States, who, in turn submitted the report to Congress on the first of March, following.

But before its acceptance could be effected the plan had to be submitted to the Advisory Sales Committee, which, as we have stated, was a committee organized to pass upon all sales made by the Custodian. The members of this Committee were: Honorable George D. Ingraham, former Presiding Justice of the Appellate Division of the First Judicial Department of the Supreme Court of the State of New York; Mr. Otto T. Bannard, President of the New York Trust Company; Mr. Cleveland H. Dodge; Mr. B. Howell Griswold, Jr., senior partner of the banking firm of Brown Brothers; and Mr. Ralph Stone, President of the Detroit Trust Company. These gentlemen were all of the highest standing, were in no way connected with the chemical industry and were serving the Government without compensation. They approved the plan and on the request of Mr. Palmer agreed to serve as trustees of the stock of the proposed purchasing corporation.

In due course a charter for the corporation was filed in Delaware embodying the terms of the plan whose substance we have given and providing a capitalization of $500,000 of which $400,000 was six per cent. cumulative preferred stock and $100,000 common stock also limited to six per cent. dividends.

When the corporation was organized Judge Ingraham of the Advisory Sales Committee and the Honorable George Gray of Delaware, formerly a judge of this court and then retired, drafted the voting trust agreement.

The listing of the patents began in February, 1919, by patent lawyers who were paid with funds temporarily advanced for the work by the American Dyes Institute and later repaid by The Chemical Foundation. When the patents had been listed, demands were made upon the Commissioner of Patents and by these symbolic acts of capture formal seizures were completed. But before the patents could be sold at private sale and assigned the consent of the President had to be obtained under the amendment to section 12 of the Trading with the Enemy Act, approved March 28, 1918. Before the President left for Europe he delegated his power under this section of the Act to Frank L. Polk, then Counsellor of the State Department. Mr. Palmer, enclosing an extract of his report to the President showing the proposed plan of sale, wrote a letter to Mr. Polk requesting that he sign the necessary order for the private sale of the patents. Mr. Polk testified that he carefully read the extract of Mr. Palmer's report. Therefore we assume that Mr. Polk knew what he was doing when he signed the order and returned it to Mr. Palmer. This order (and another signed later) purported to authorize a private sale of enemy-owned patents to The Chemical Foundation on the terms we have recited. Moreover, Mr. Palmer testified that in an interview on March 3, 1919, he explained the whole transaction to the President and recommended that, as he was about to resign in order to become Attorney General, the President consider Mr. Garvan as his successor because of his valuable services in the Bureau of Investigations, his familiarity with the chemical industry and in view of the fact that under the plan of Americanizing that industry he was to be President of the purchasing corporation. Mr. Palmer carried with him a blank com-

mission which the President filled in and signed, appointing Mr. Garvan Alien Property Custodian. It is entirely clear from his uncontradicted testimony that Mr. Palmer fully acquainted the President with the proposed disposition of the German patents and the Americanization of the chemical industry and that it had the President's approval.

(It may be noted that the President had long known the relation of the organic chemical industry to modern warfare. In January, 1916, before the United States entered the war, Mr. Henry B. Thompson, President of the National Association of Finishers of Cotton Fabrics, discussed with him the dependence of the nation upon organic chemistry for its munitions and urged him to do something, at least in the way of tariffs, toward creating an American dye industry for national defense.)

On April 10, 1919, the first of several assignments of patents was made and The Chemical Foundation began business. Other assignments followed. In the meantime certain doubts arose in regard to the transfer of various rights connected with the properties assigned. In order to avoid the possibility of having a question raised in connection with the validity of the sale, the President on February 13, 1920, executed an instrument broadly ratifying the transaction.

We shall not review the great volume of testimony concerning the way in which The Chemical Foundation performed the trusts imposed by the sale. It is enough to say that it granted the United States free licenses for all government purposes under all the patents it had acquired; that it granted licenses on equal terms to all applicants save one; that it received from the licenses very substantial revenues, none of which has it disbursed in dividends and all of which it has expended for the advancement and development of chemical science in the United States; and that its efforts and expenditures are reflected in the progress of the chemical industry in the United States which in 1920, according to a report of the Senate Committee on Finance (not "at the time the sale took place" as the Government represents), was producing about 90 per cent. of the dyes needed in this country, and in 1922, as shown by a report of the Tariff Commission, was producing 93.5 per cent. This, greatly compressed, is the story of the case told by the evidence as we read it.

We have reached the discussion and shall now review the questions raised by the Government in assigning errors in the decree of the court dismissing the bill. All matters touching the merits of the case will, of course, be laid aside; also all comments on the policy of Congress in its enactments, for with the policy of legislation the courts have nothing to do. We are concerned only with the legality of what was done. The legality of these things depends on questions of power—power of Congress to enact the Trading with the Enemy Act and power of Government officials under the Act to execute the transaction which they put through, and then, if such existed, on questions whether the Government officials lawfully exercised their power.

These questions rest for their solution first on the constitutionality of the Trading with the Enemy Act and next on the meaning of that Act; and its meaning, in turn, depends on the construction properly to be given its terms. Admissions by the Government made in its brief and at the oral argument have materially simplified the issues of this case and have relieved us of the necessity of discussing many matters presented and urged in the District Court. Before construing the statute we shall summarize these admissions:

Addressing itself to the Trading with the Enemy Act and its several amendments, the Government does not question the sovereign power of the United States to seize enemy property as a war measure, and having seized it, it does not question its sovereign power to confiscate it. It admits that the supreme power over the property in this case was in Congress and that Congress could delegate to the Alien Property Custodian power to seize it. Therefore, it admits that the seizure of the patents by the Alien Property Custodian was lawful. It further admitted at the oral argument that Congress could delegate to the Alien Property Custodian power to sell the seized patents and that, if properly exercised, the Custodian could assign the patents and vest complete title in the purchaser, and that thereafter the patents would be free from the power of a court of equity to lay hands on them. Further, the Government admits that a private sale of such property, when authorized by the President in the public interest, would be lawful, and that the determination by the President that such a sale would be in the public interest, being the exercise of discretion vested in him as the Chief Executive would not be open to inquiry by the courts. It also concedes that it was the policy of Congress, as indicated by the statute, to eliminate enemy-ownership of enemy-held properties in this country and to place those

properties in American hands and render them available for the needs of war.

[2] By these admissions on the law, concerning which it is now needless to repeat the discussion into which the learned trial judge was compelled to enter, we are enabled to come directly to the complaints of the Government, which, grouping the assignments of error, it has condensed into six propositions. The first of these, and the most important, is error charged to the trial court "in its construction of the Trading with the Enemy Act, and especially of section 12 thereof, conferring upon the Custodian power of sale of property in his custody pending final disposition thereof by Congress." The very center of this controversy therefore is section 12 of the Act. As originally enacted it read as follows:

"The alien property custodian shall be vested with all of the powers of a common-law trustee in respect of all property, other than money, which shall come into his possession in pursuance of the provisions of this Act, and, acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, may manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights which may be or become appurtenant thereto or to the ownership thereof, if and when necessary to prevent waste and protect such property and to the end that the interests of the United States in such property and rights or of such person as may ultimately become entitled thereto, or to the proceeds thereof, may be preserved and safeguarded. * * * The alien property custodian shall forthwith deposit in the Treasury of the United States, as hereinbefore provided, the proceeds of any such property or rights so sold by him." (40 Stat. 423.)

The basic considerations which moved Congress to this legislation were, in its own words, "the safety of the United States" and "the successful prosecution of the war." These vital objects appear throughout the Act and its subsequent amendments. At the time the law was enacted this country had but lately entered the war and it was uncertain just what was necessary for the safety of the nation and the successful prosecution of the war in respect to trading with the enemy. Therefore the law as originally enacted contemplated nothing more than taking and holding enemy property and was a purely conservation measure. On this everyone agrees. Also, everyone concedes that upon the seizure of enemy property under authority of the Act the title of the enemy-owners passed out of them. Passing out of them, it went somewhere. The Act, however, does not say where the title went, that is, whether it vested in the Custodian or in the United States, or whether the legal title vested in the Custodian and the equitable title in the United States. This question is academic to the issues here involved and does not call for decision, for, in any event, the United States reserved to itself the whole beneficial interest and gave the Custodian "powers" over the property. As to these powers the statute said that "in respect of all property * * * which shall come into his possession in pursuance of this Act," the Custodian "shall be vested with all the powers of a common-law trustee," meaning by that inartificial expression, we imagine, the powers of a trustee in equity. The powers of a trustee are always limited by the instrument creating the trust, so here the Custodian's powers were limited by the Act to conservation of the property and extended to its disposition by sale only when necessary to prevent waste. It authorized him to hold, manage and protect it "to the end that the interests of the United States in such property or of such person as may ultimately become entitled thereto, * * * may be preserved and safeguarded." The purposes for which, in the alternative, the Custodian as trustee was authorized to hold seized property are significant, for they show quite clearly that as of that date (October 6, 1917) Congress had not determined what it would do with property thus seized under its war power. So, by section 12 it said in effect that, except when sold to prevent waste, the Custodian shall preserve and safeguard the property for the United States or (using the disjunctive) for anyone else who ultimately may become entitled to it. Congress further indicated its uncertainty as to what disposition of seized property it would ultimately make by providing in a later paragraph in the same section that:

"After the end of the war any claim of an enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct."

Thus, by the Act of October 6, 1917, Congress carefully reserved to itself complete freedom of action in the future.

But Congress concluded, as it had full power to do, not to wait until "after the end

of the war" to determine who should be entitled to seized enemy-property—whether previous enemy owners or the United States. So, on March 28, 1918, Congress, to meet the problems of the Alien Property Custodian and to strike a blow at the enemy in the darkest hour of the war, determined that question then and there by repealing section 12 and enacting a new section in its place.

"When the law distinguishes we look for some difference," and when a legislative body repeals one provision of a statute and substitutes another we also expect to find some difference in the provision newly enacted and the provision repealed and also some difference in the situations from which the two provisions arose and in the purposes intended to be effected first by one and then by the other. And such difference in situation and purpose is clearly disclosed.

The Amendment repeats substantially the words of the original section down to the word "Act," vesting the Alien Property Custodian "with all of the powers of a common-law trustee in respect of all property" coming into his possession in pursuance of its provisions, and then in new words continues:

"And, in addition thereto [that is, in addition to the powers of a common-law trustee], acting under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe, [the custodian] shall have power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof: Provided, That any property sold under this Act, except when sold to the United States, shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement of time and place of sale which shall be where the property or a major portion thereof is situated, unless the President stating the reasons therefor, in the public interest shall otherwise determine: * * * The alien property custodian shall forthwith deposit in the Treasury of the United States, as hereinbefore provided, the proceeds of any such property or rights so sold by him. * * *

"After the end of the war any claim of an enemy or of an ally of enemy to any money or other property received and held by the alien property custodian, or deposited in the United States Treasury, shall be settled as Congress shall direct."

It is evident that by this amendment Congress transformed the Trading with the Enemy Act from a purely conservation measure to one of action, definite and drastic. It no longer left the ultimate disposition of seized enemy property in suspense but determined its disposition with finality. While it gave the Custodian the same custodial powers which it had previously vested in him, Congress gave him additional powers over seized enemy property to meet a war situation which had arisen since the date of the original enactment and to meet other war situations as they should arise in the future. It did not limit these powers to the sale of the seized property but gave the Custodian the broad "power to * * * make any disposition thereof"—dis+ponere, to displace. As though this were not enough, the provision continues: "disposition thereof, by sale or otherwise." As we are not presently concerned with a disposition of seized property otherwise than by sale, we advert to the word "otherwise" in the power merely to observe that Congress, seeking to confer very broad powers upon the Custodian, authorized him to dispose of the property in ways other than by sale. But when disposed of by sale Congress sought to confer upon the Custodian still broader powers by using terms which in themselves seem to confer a power almost without limit. They are: "Power to * * * make any disposition thereof, by sale or otherwise, * * * in like manner as though he were the absolute owner thereof." Had the section stopped here we are clearly of opinion that the power thus conferred, if properly exercised, would embrace the disposition of the patents by a sale of the kind in controversy. But, in the next words, the section tentatively limits "disposition * * * by sale" by providing "that any property sold under this Act, except when sold to the United States (the latter phrase indicating still further the breadth of the Custodian's power of disposition) shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement. * * *" Obviously, these are limitations on the Custodian's power of disposition by sale, and had the section ended here the transaction of sale in the case at bar would, of course, be invalid. But the section immediately withdrew these limitations by making an exception, which is that seized property "shall be sold only to American citizens, at public sale to the highest bidder, after public advertise-

ment, * * * unless the President stating the reasons therefor, in the public interest, shall otherwise determine." When the President had otherwise determined, as we shall assume for the moment he did in this case, the effect of his determination "otherwise" was, as we construe the statute, to annul, for the occasion, the limitations of the Custodian's power to dispose of seized property at public sale to American citizens at the highest bid after advertisement and leave him with all the "power to * * * make disposition thereof, by sale or otherwise, * * * in like manner as though he were the absolute owner thereof"—just as though the quoted paragraph giving him this power had come to an end at the point immediately preceding the limiting provisos.

[3] The question is therefore reduced to this: Having received the President's authority, did the first paragraph of section 12, as amended, give the Custodian power to dispose of the patents to the respondent at private sale upon the conditions and for the consideration named? The Government says it did not for a number of reasons; first, for the reason that, as it interprets the section, "the change of policy with respect to sale of enemy property embodied in the Amendment of March, 1918, did not change the policy of conservation but only authorized a conversion of property into cash while in custody, reserving to Congress the determination after the war of all questions as to final disposition thereof." Conceding that it was the policy of Congress to eliminate German ownership and put the seized properties of Germans in American hands and render them available for war, the Government nevertheless maintains that "this policy could and was intended to be fully carried out and this purpose completely accomplished by fair sale of this property to American citizens, and by the substitution therefor of its fair equivalent *in cash* in the hands of the Treasurer of the United States." Stated differently, the contention of the Government is that, "the property in the hands of the Custodian was held with the enemy interest in suspension awaiting the final action of Congress as to the disposition thereof after the war. If Congress intended to return it or its proceeds to the original owners, no beneficial interest therein would ever have accrued to the United States or the people thereof; * * * Congress has never created any trust of this property for the benefit of the nation and could not do so out of property which had never been acquired by confiscation or oth-

erwise and which was not owned by the Government." Using its words, we think this fairly states the position of the Government, and it is based on two propositions, either one of which, if sound, sustains its conclusions. The first is that the Custodian, even without the descriptive words of the section, is a fiduciary, subject to all the familiar duties and obligations of an ordinary trustee; that the powers of a "common-law trustee" with which the amended section vested the Custodian charged him with the duty to conserve the estate just as the original section did, and that the additional power conferred upon him by the amendment—the power to sell seized property—was subordinate to and therefore was to be exercised in consonance with his trusteeship; and that as an ordinary trustee in equity can sell trust property only for money, and only for the largest amount obtainable, the Custodian was bound to sell the seized patents at a price which would bring the largest return in dollars and was not authorized to be influenced by other considerations, however advantageous they were to the United States, or, even though they affected the life of the nation. We think there is infirmity in this premise and that, in consequence, the syllogism is faulty. The statute provides for public sale to the highest bidder *"unless* the President, stating the reasons therefor, in the public interest, shall otherwise determine." The inevitable logic of this provision is that when the President shall, in the public interest, determine otherwise, seized property may be sold at private sale to a lower bidder. This expression of the section contemplates something more than money because by its terms it calls upon the President to regard the public interest in departing from the statute's general rule of public sale. Public interest is not limited to dollars. When therefore in the public interest the President authorizes a private sale, the statute permits the Custodian to dispose of the property "in like manner as though he were the absolute owner thereof." An absolute owner is at liberty to consider and impose conditions of sale and to be influenced by something other than the monetary return. It is common knowledge of all lawyers and many business men that the highest bid is not always the best bid and that a lower bid may be the best bid when based on conditions sufficient to overbalance the difference between the two. And so here, concededly, the patents were sold for less than their value to their previous German owners, and perhaps less than their value to the United States had

they been offered at public sale without conditions, for then the purchasers would have acquired them with their characteristic of monopolies in force. But when the President determined that the public interest required that they should be sold at private sale, it was, we surmise, lawful for the Custodian in fixing the terms of the sale to keep the public interest in mind, as he did in this case, and impose conditions which would be not only advantageous to his principal but would carry out the express purpose of the Act by assuring "the safety of the United States." With these conditions announced it is obvious that the money price would be less than the price which would be obtained at a sale without conditions.

So long as the Custodian had seized property in his hands, and until he had disposed of it under the new powers given him by the amendment, he was, of course, bound to conserve it with all the care of a trustee. Property not sold and remaining in his possession was "after the end of the war" subject to ultimate disposition by Congress. But when, before the end of the war, he acted under the powers of disposition newly given him (and under the authority of the President to sell otherwise than at public sale), he was, by the new instrument of trust as we may call it, relieved of his custodial duties, and was authorized to sell the property free of any trust for a price and on such terms and conditions as, under the President's supervision, he should decide upon; and on such a sale, in the absence of fraud, all title to the property passed to the purchaser—not to be divested "after the end of the war."

[4] The other proposition which the Government advances against this sale under the statute is that to divest enemy property of enemy interests and vest it in the Custodian with full power of final disposition, the enemy property must first be confiscated; that power of confiscation resides in Congress alone, and that Congress never having confiscated the patents in question, their sale by the Custodian in the public interest was in effect a confiscation by him. We are not persuaded to this view because two things had happened: First, Congress, knowing that enemy property cannot be condemned without an act of Congress, Brown v. United States, 8 Cranch, 110, 3 L. Ed. 504, enacted the Trading with the Enemy Act as a strictly war measure, having its sanction in the Constitutional Provision, art. 1, § 8, cl. 11, empowering the Congress "to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water." Commercial Trust Co. v. Miller (C. C. A.) 281 F. 804; Miller v. United States, 11 Wall. 268, 305, 20 L. Ed. 135. Congress could not physically make captures of enemy property itself, so by this Act it created the Alien Property Custodian and employed him as an instrument to that end. Under the Act as originally passed and as amended, Congress authorized him to seize and hold property of enemy aliens. Upon seizure the title of the enemy-owners was not held "in suspension" but passed out of them and became vested, legally or beneficially, in the United States. But this is not all that Congress did. Concluding not to wait until the end of the war to dispose of seized property either by restitution or appropriation, it disposed of it by the amendment of March 28, 1918, in the only way it could, namely; by employing some instrument to carry out its will. This it did by again using the Alien Property Custodian and empowering him, under the supervision and direction of the President, to dispose of seized property at public sale, or otherwise when in the public interest the President should so determine. When the Custodian acted under the power which Congress granted him and under the direction of the President in the public interest, he was a mere instrument selected by Congress to carry out what it had determined should be done. His act was not the exercise of legislative power delegated to him, but was the act of Congress operating through him with the same effect and validity as though Congress itself had made the capture and the sale. Although, admittedly, the Custodian acted under the power only when in his judgment an occasion for its exercise arose, we find no infirmity in this for such action is in consonance with years of practice sustained by a long line of decisions of which the most familiar are: Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294; Union Bridge Co. v. United States, 204 U. S. 364, 380–383, 27 S. Ct. 367, 51 L. Ed. 523; Monongahela Bridge v. United States, 216 U. S. 177, 30 S. Ct. 356, 54 L. Ed. 435; Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525; United States v. Grimaud, 220 U. S. 506, 516–521, 31 S. Ct. 480, 55 L. Ed. 563; Selective Draft Law Cases, 245 U. S. 366, 389, 38 S. Ct. 159, 62 L. Ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856. The following excerpt from the opinion in Field v. Clark shows the law:

" 'The true distinction,' as Judge Ranney speaking for the Supreme Court of Ohio has

well said, 'is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' Cincinnati, Wilmington &c. Railroad v. Commissioners, 1 Ohio St. 88. In Moers v. City of Reading, 21 Penn. St. 188, 202, the language of the court was: 'Half the statutes on our books are in the alternative, depending on the discretion of some person or persons to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said that the exercise of such discretion is the making of the law.' So, in Locke's Appeal, 72 Penn. St. 491, 498: 'To assert that a law is less than a law, because it is made to depend on a future event or act, is to rob the legislature of the power to act wisely for the public welfare whenever a law is passed relating to a state of affairs not yet developed, or to things future and impossible to fully know.' The proper distinction, the court said, was this: 'The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation.'"

For these reasons we are of opinion that the sale was made by the Custodian within the powers conferred upon him by the statute and is to that extent valid. It remains to be determined whether in making the sale the Custodian validly exercised his powers.

The Government, by the next group of assignments of error, asserts that, aside from all questions of power, the sale and assignments of patents to The Chemical Foundation "were illegal and void, as being in violation of section 41 of the Criminal Code of the United States and to those principles of law and equity which forbid a fiduciary to make sale of trust property in his custody to himself or to a corporation of which he is the head." Section 41 of the Criminal Code reads as follows:

"No *officer or agent* of any corporation, * * * or *person directly or indirectly interested* in the pecuniary profits or *contracts* of such corporation, * * * shall be employed or *shall act as an officer or agent of the United States for the transaction of business with such* corporation. * * * Whoever shall violate the provision of this section shall be fined not more than two thousand dollars and imprisoned not more than two years." (35 Stat. 1097.)

Although this is not a criminal action and the persons charged with violating this statute are not presently on trial, the Government, quite logically, finds it necessary to convict them (potentially at least) in order to sustain its contention that because of their crime the things they did are void.

This is a subject of extreme delicacy. No implications are involved for, quite the contrary, it is based on direct accusations. The Government charges that at the time the sale and assignments of the patents were made (with the exception of the last two) the forbidden relations of the parties conducting this transaction for the Government and for The Chemical Foundation, the seller and purchaser, respectively, were as follows:

Francis P. Garvan was Alien Property Custodian and President of The Chemical Foundation; Douglas I. McKay was a representative of the Custodian and Vice-President of The Foundation; George J. Corbitt was a representative of the Custodian and Secretary and Treasurer of The Foundation; Messrs. Garvan, McKay and Corbitt, when holding the government positions above set forth also constituted the Board of Directors of The Foundation; Joseph H. Choate, Jr., when Chief of the Chemical Division of the Bureau of Investigations under the Alien Property Custodian, became general counsel of The Foundation; Ramsay Hoüget was patent attorney for the Custodian and also patent attorney for The Foundation; Otto P. Bannard, George D. Ingraham, Cleveland H. Dodge, Benjamin H. Griswold, Jr., and Ralph Stone, constituting the Advisory Sales Committee of the Custodian were also voting trustees of the common stock of The Foundation. The Government, charging these gentlemen with felony, continues:

"The mere statement of these facts in the light of the broad and clear language of the statute should, we submit, be sufficient to dispose of this case; to establish the illegality of the transaction in question and the right of the Government to a decree."

We are of opinion that more than this is required, because the criminality of the parties named and the invalidity of the things

they did depend first on the law and then on facts not found in the statement.

[5] There is no doubt that section 41 of the Criminal Code was in force at the time the transaction of sale was consummated, but there is doubt whether that section of the Criminal Code applies to a transaction of this kind. And this is because section 7e of the Trading with the Enemy Act expressly provides that,

"No person shall be held liable in any court for or in respect to anything done or omitted in pursuance of any order, rule, or regulation made by the President under the authority of this Act."

The learned trial judge held that by reason of this provision section 41 of the Criminal Code is without relevancy to the acts done, and, hence, without relevancy to the issues in this suit. We avail ourselves of his discussion to show our grounds for arriving at the same conclusion. 294 F. 334, 335.

Aside from the law, we are of opinion that, on the facts, the transaction does not come within the offense defined by the criminal section, for these reasons:

In defining the offense the statute discloses that it has several elements; (a) that the offending person shall hold opposite and incompatible positions, in that (b) he shall be an officer or agent of the United States and (c) at the same time an officer or agent of a corporation engaged in a transaction with the United States, and (d) as such he shall be directly or indirectly interested in the pecuniary profits or contracts of such corporation. In searching the transaction for these essential ingredients of the offense, we repeat what we have already found, that the transaction was conceived by Mr. Palmer, that the terms of the sale were dictated by him and that the contract of sale (as distinguished from its performance) was completed by him when he was Alien Property Custodian. This finding may be challenged on the ground that at the time Mr. Palmer was Alien Property Custodian and the contract was made The Chemical Foundation had not been incorporated and therefore it was not in existence. That is true. But it is familiar business practice for persons to negotiate and fully complete contracts for the benefit of corporations intended to be organized and, of course, not in existence, and the courts sustain such contracts when later the corporations are organized and they assume the contracts. Commonwealth Steamship Co. v. American Shipbuilding Co. (D. C.) 197 F. 780, 797; Id., 215 F. 297, 131 C. C. A. 596;

5 F.(2d)—14

Irwin Glass Co. v. Buchanan (C. C. A.) 289 F. 348, 350.

When Mr. Palmer made the contract of sale Mr. Garvan was an officer of the United States serving his government without compensation, being one of that class generally known as "dollar-a-year men." He was not then an officer of The Chemical Foundation. When, later, he became Alien Property Custodian and also president of The Chemical Foundation, there was present the element of two official positions, and in these positions it is true he carried out the contract previously made, but there was lacking the element of a direct or indirect interest on his part in the pecuniary profits or contracts of The Foundation, for he agreed to serve as its president without compensation and he has kept his agreement. He has not received from it any money for any purpose, even for his expenses. Moreover, the by-laws of the corporation provide that the president and vice-president shall serve without pay. Mr. Garvan, together with Mr. McKay and Mr. Corbitt, while holding positions under the United States and at the same time acting as directors of The Foundation, were not holders of the stock of the corporation other than shares placed in their names to qualify them as directors. Therefore, with respect to these three gentlemen there is wholly lacking the element of a direct or indirect pecuniary interest in the profits or contracts of The Foundation.

Coming to Mr. Choate, we find him in the same position with Mr. Garvan in that he was a dollar-a-year man in the service of the Government at the time another (Mr. Palmer) made the contract.

Mr. Houget was an attorney and, like Mr. Choate and Mr. Garvan, was not an officer of The Foundation when the contract was made.

Judge Ingraham, Mr. Bannard, Mr. Dodge, Mr. Griswold and Mr. Stone were all dollar-a-year men when the contract was made by Mr. Palmer and also later when they became voting trustees of the corporation. No one of these gentlemen, and no one of the others just named, owned a single share of stock of The Foundation or was interested in the chemical industry. In consequence all lacked the element of pecuniary interest in the profits or contracts of the corporation. And finally, if the ten persons named violated the cited criminal statute, they did it with the full knowledge and complicity of the other participants—Mr. Palmer, Mr. Polk, Judge Gray and President Wilson. An examination of the evidence, however, makes

it clear that at no time did any one of these gentlemen perform acts within the offense defined by the law. It follows that the transaction was not consummated in violation of this criminal statute and therefore it is not invalid on this ground.

The contention that the sale and assignments were illegal and void because in conflict with settled rules and principles of law and equity applicable to such transactions does not, in view of our construction of the Trading with the Enemy Act, call for separate discussion. We have considered it in our discussion of other subjects and shall touch upon it again in connection with another matter.

The Government, by other assignments of error, takes the position that the President did not give the Alien Property Custodian the requisite authority to make a private sale of the patents in question, and, lacking that authority, the sale is void.

[6] On December 3, 1918, the President, on the eve of going abroad, made a number of executive orders addressed to the Alien Property Custodian the Federal Trade Commission and Frank L. Polk in one instrument. The part pertinent to this inquiry is the following:

"V. I hereby vest in Frank L. Polk all power and authority conferred upon the President by the provisions of Section 12 of the said 'Trading with the Enemy Act' as amended. * * *

"Woodrow Wilson."

Under authority of this executive order Mr. Polk made the two orders purporting to authorize the Custodian to make a private sale of the patents to The Chemical Foundation on the terms named, stating the reasons therefor in the public interest. The Government says these orders are invalid because the President's order of December 3 is itself invalid. It challenges the validity of the President's order, first, because it is addressed to a person, not to an official; next, because it is a confidence reposed by him in a person, not in an official; and, lastly, because the President had no right to delegate the authority at all. True, no official designations were made. Yet there can be no doubt as to the identity of the men whose names appear in the order. One was Counsellor of the State Department, the other the President of the United States. To men in such stations, titles add nothing. The solitary name "A. Lincoln" comes to the eye of every student of Civil War literature, as do the names of officers whom that immortal

Commander-in-Chief addressed quite informally on grave official matters. We apprehend no one ever questioned the official character of those communications. Moreover, in official intercourse between officers high in the Government service something very definite must appear to induce a finding that a power reposed by one in the other was personal in the sense of a confidence such as a testator reposes in a named testamentary trustee. There is nothing in the record which indicates that the President in making the executive order of December 3, 1918, reposed a confidence in Mr. Polk personally. Therefore, by every intendment of law it must be found that he contemplated the exercise of his authority by an officer engaged in the same public service.

[7] At all events, the President, by executive order of February 13, 1920, quieted all doubts in this regard by confirming the actions of the Alien Property Custodian taken pursuant to Mr. Polk's orders, and by words sufficiently comprehensive to cover the whole transaction ratified the sale to The Chemical Foundation.

[8] While on the subject of confirmation and ratification we shall briefly dispose of two contentions of The Foundation: One is that the transaction was also ratified by Congress. This is based on the inaction of Congress following its receipt, on March 1, 1919, of Mr. Palmer's report to the President showing the proposed sale to The Foundation and the reasons therefor. Congress cannot be estopped by its silence from exercising its constitutional power of legislation. Nor does the silence of Congress indicate its approval or disapproval of matters coming to its knowledge in the course of its deliberations. The only significance of submitting the report of the proposed transaction to Congress and through Congress to the public is that such an act is unusual for one engaged in a conspiracy against the Government.

[9] The Foundation maintains that the transaction was also confirmed and ratified by the United States in the Treaty of Berlin. We find no substance in this contention. The most that the United States did by the Treaty of Berlin was to recognize, not ratify, the transaction. This is what happened: When the President went to Paris he took with him a representative of the Custodian intimately informed on all the details of the patent transaction and retained him there throughout the negotiations in order to have the facts of the situation available. By the Treaty of Versailles it was provided that as

between the Allies and associated powers and their nationals on the one hand and Germany and her nationals on the other hand, all the exceptional war measures, or measures of transfer, or acts done or to be done in execution of such measures (named in certain paragraphs and with reservations not here pertinent) should be considered as final and binding on all persons, Treaty of Versailles, part X, art. 297(d), and that the nationals of each government should look to their own government for the redress of whatever wrongs they had suffered. This covered what the United States had done in respect to German patents. By the Treaty of Berlin, Germany gave to the United States and the United States accepted the benefits of the Treaty of Versailles among which were the benefits of the patent transaction. This action by treaty between Germany and the United States, while significant, would of course not estop the United States from asserting any rights it may have against its own citizens.

[10] Returning to the President's order to Mr. Polk, the real point of this phase of the case, as we observe it, is whether the President under the Trading with the Enemy Act could validly delegate to another official the exercise of the discretionary powers conferred upon him by section 12. Certainly he could not, unless the statute authorized him to do so. And this, we think, the statute did.

The war being on, Congress gave the President—the executive of the nation and the Commander-in-Chief of the Army and Navy —war powers and imposed upon him duties which were vast in number and amazing in magnitude. Conscious that no living man could perform all of them, it authorized him in large measure to delegate those powers and duties to his subordinates. In the field of war activities touching trading with the enemy, Congress by the Act in question imposed particularly heavy duties upon the President and conferred upon him many powers, but by section 5 of the same Act it said:

"The President may exercise any power or authority conferred by this Act through such officer or officers as he shall direct."

Mr. Polk was an officer of the United States within the meaning of the Act; a constitutional officer appointed by the President and confirmed by the Senate. Burnap v. United States, 252 U. S. 512, 514, 515, 40 S. Ct. 374, 64 L. Ed. 692. The authority thus conferred upon the President to exercise his powers through others was broad. By express terms it included the exercise of

"any" power. One of the President's powers was that of determining when, under section 12, seized enemy property should, in the public interest, be disposed of otherwise than at public sale. If the question of the President's exercise of this war power through another were raised without precedent for its solution we should not hesitate to affirm it, but now the solution of the question is made easier by decisions of the Supreme Court sustaining the delegation of powers and duties committed to the President by this Act which are similar in their quasi judicial and discretionary character to the one in question. Stoehr v. Wallace, 255 U. S. 239, 244, 245, 41 S. Ct. 293, 65 L. Ed. 604; Central Trust Co. v. Garvan, 254 U. S. 554, 41 S. Ct. 214, 65 L. Ed. 403; Commercial Trust Co. v. Miller. 262 U. S. 51, 53, 43 S. Ct. 486, 67 L. Ed. 858; Behn, Meyer & Co., Ltd., v. Miller, 45 S. Ct. 165, 69 L. Ed. ——.

We cannot subscribe to the contention of the Government that the power of delegation conferred upon the President by section 5 is limited to section 7 (c) of the Act. We are of opinion that it extends as well to section 12 as amended.

[11] Having decided that the sale of patents was made under powers conferred by the statute with the authority of the President, and that to this point the transaction is valid, the next contention of the Government is that, even so, the sale is void and conferred no title upon the purchaser because irregular in particulars which we shall briefly note.

These alleged irregularities go mainly to the amount paid for the patents and the conduct of the parties in fixing the price. On these matters there is a mass of testimony whose applicability and probative force are in great confusion, due evidently to the different views of the opposing parties as to the powers and duties of the Custodian in disposing of the patents. The Government says: "The consideration of the question here presented is predicated upon the discussion of the provision and construction of the Trading with the Enemy Act," and, accordingly, the Government, pursuing its theory that the statute raised a pure trust and stopped there, bases its argument against the irregularities upon the principle that,

"One fundamental essential of a sale by a trustee or any person occupying a confidential position is that it must be a fair sale in every sense of that word, and the property must be sold under such conditions as will enable it to bring its fair equivalent in money."

On this contention the evidence shows one thing. But we have held that even though he had powers of a trustee, the Custodian, "in addition," was authorized by the statute to do what he did. In that situation the evidence shows another thing. In determining whether the price paid for the patents was grossly inadequate,—the main irregularity charged—it will, therefore, be necessary first to find in what way was it inadequate—inadequate in respect to what, or inadequate in respect to whom?

This will require us to view the evidence from three angles. If, in looking at it in one way, inadequacy of price means that the $250,000 paid was not enough in that it was less than the value of the patents in the hands of their previous German owners, we promptly say the price was grossly inadequate. But the patents passed from the German owners when they were seized, therefore we are not concerned in this case with their value to the Germans. Thus a large part of the testimony on the question of inadequacy of price must be set aside. On leaving the Germans the patents passed to the United States, becoming its property, either legal or equitable. Hence, we must determine their value to the United States, their new owner—first, at public sale and then at private sale.

In making this inquiry we have constantly kept in mind that the Trading with the Enemy Act expressly directs that when seized property shall be sold at public sale it shall be sold "only to American citizens," and that the transaction of private sale here in question followed that statutory policy and likewise limited the sale to a corporate American citizen. So the value of the patents to the United States was their value in the American market. What was the character of that market at the time? It had but started in the organic chemical art and knew little of the subjects-matter of the patents and less of their value. If the patents had been put up at public sale (without restrictions or conditions, and carrying full monopolies) with the single intention that they bring "their fair equivalent in money"—this is the second angle—any one who contemplated making a bid would have been confronted by the problem normally incident to such matters and, in that particular case, by an abnormal problem as well. The normal problem would have been the worth of the patents.

The true value of a patent, and particularly of an unadjudicated patent, is, from its very nature, difficult, if not impossible, to determine. A patent is valid and therefore valuable only if it cover invention, and invention is involved only if the subject matter be new and useful within the meaning of the term "invention," which is impossible of definition. Again, the thing—mechanism, product, or process—may be "useful" in the sense of invention but not "usable" in a practical sense, and if not usable it therefore may not be valuable. With patents of this class the Patent Office is crowded. John Barker Waite in his treatise on Patent Law (107), from which we quote without intimating an opinion on his words, says:

"There are, for instance, of record, in the neighborhood of 700 patents for various types of explosion turbines and parts thereof. Yet manufacturers are unanimous in saying that a usable, practicable, explosion turbine cannot be built, so far as present knowledge of metals goes. It is evident therefore that these 700 patents are not for "usable" devices; yet no one would deny that they are valid patents."

Moreover, some of the patents are product patents, that is, patents for products with nothing to show how to make them. More serious still,—such a sale being limited to American citizens,—the evidence discloses that American citizens had at that time very little of the "know how," and hence the process patents meant less to them than to the Germans. Here is the abnormal problem. Then again, German patents have not always enjoyed the best reputation. Alpha Portland Cement Co. v. Schratweiser, 221 F. 258, 259, 137 C. C. A. 111; Rohm et al. v. Martin Dennis Co. (C. C. A.) 263 F. 388; Seward's Science and the Nation, p. 18, the disposition of German applicants for patents being to make meager and sometimes insufficient disclosures. For example, Dr. Holdermann, who was a member of the German firm which before their seizure owned the Haber nitrogen-fixation patents and who came from Germany to attend the trial of this case, testified that these process patents (fifty-eight in number) are worth $17,000,000, yet the learned trial judge found on evidence which we think abundantly sustains him that, because their disclosures are of doubtful adequacy even to Germans other than those specially trained under the patents, and because their disclosures are wholly inadequate to workers in the chemical art in America, these patents are without substantial affirmative value to American citizens.

This brief discussion of patent values may throw some light on the very real difficulty of fixing prices that might have been paid for

the German patents by American bidders if they had been offered at public sale. Difficult as the problem is, we are, nevertheless, of opinion that $250,000, if paid for the outright, unlimited and unconditional purchase of these patents by American citizens at a supposed public sale would be inadequate, and we base our conclusion on the royalties which were being paid and received for some of them in 1919. But the $250,000 paid for the patents in the transaction in question was not paid for an unrestricted and unconditional purchase. Therefore the true inquiry—and this is the third angle—is whether the price was adequate under the terms of the actual sale. Put in another way, assuming that the legal or equitable title was in the United States, and assuming of course that the United States had a right to full return for its property, was the price adequate? That depends upon how the patents were sold and what the United States got in return. By authority of the Act, which means by authority of Congress, the patents were sold stripped of their characteristic of monopolies and sold on conditions that the United States should have free licenses under all of them and that its citizens should have nonexclusive licenses on equal terms. These, briefly, were the conditions. What did the United States receive? It received the $250,-000; it also received licenses under the patents; and it obtained the creation of an industry which stands equipped, manned and maintained in full operation ready to be converted at once into a line of national defense in the event of war. There is no evidence of the value of the licenses which the Government received, nor, very naturally, is there evidence of the value of the national defense in chemical warfare placed in the Government's hands. Yet, we surmise, these things have values, and, taken together, we believe they are greater than the value of the patents at the time of their sale. We are of opinion that the price paid in the circumstances was not inadequate.

We shall not discuss the other alleged irregularities in the sale for, like that of inadequate price, they disappear from the case on our construction of the statute. For the same reason we shall not review the Government's contention that the transaction constituted in legal effect an unauthorized confiscation of property and a donation thereof to private industry in violation of the Constitution and laws of the United States.

The remaining contention of the Government is that the alleged sale and assignments of the patents are illegal and void in that they were induced, brought about, and accomplished in pursuance and as a result of an unlawful scheme or conspiracy. Early in the trial, the learned judge, realizing the gravity of the charges made and the issues involved in the case, lowered all barriers to the admission of evidence and announced that each party to the suit would be permitted, without regard to the usual rules of evidence, to take and put on record all evidence that, in the opinion of its counsel, would in any manner tend to prove or disprove any issue. Throughout the trial he adhered to this announcement except when on cross-examination the Government sought to bring out and uncover secret processes which certain licensees had, at great cost and labor, developed in attempting to practice the inventions of some of the patents. He ruled—rightly, we think—against such questions.

By this action of the judge in suspending the rules of evidence the way was made clear for the Government to prove the scheme or conspiracy it had charged in the bill. It had charged a conspiracy entered into by "persons, firms, corporations and trade associations and others associated with them in said industry * * * to induce and procure the seizure of enemy-owned patents," etc. Not being satisfied with its progress, the Government during the trial shifted its charge from the persons named in the pleading to the officers of the Government (not named in the pleading) who formulated the plan and carried out the sale. These are all the previously named officers and agents of the Government participating in the transaction except the President against whom the charge is withheld on the theory that he was either uninformed or misinformed as to what was going on.

The Government has insistently pressed its charge of conspiracy throughout the proceedings in the trial court and here on appeal. We have therefore kept the subject constantly before us in our study of the case and in our deliberations. It will be enough to say that we have found no evidence that sustains either the charge of conspiracy first made against representatives of the industry or the charge of conspiracy later made against officers and agents of the Government.

Resolving against the appellant the question of costs raised by its eighteenth assignment of error, the decree below is
Affirmed.

BUFFINGTON, Circuit Judge. I concur in the conclusion reached by the court

but, in one particular, on different grounds. The act of Congress on which this sale rests provides, "That any property sold under this act, except when sold to the United States, shall be sold only to American citizens, at public sale to the highest bidder, after public advertisement * * * unless the President stating the reasons therefor, in the public interest shall otherwise determine." In my judgment Congress by this twelfth section of the act confided a personal trust and imposed a personal duty on the President. It was the President who was to determine, and his determination involved his ascertainment of public necessity and his statement of the reasons thereto moving him. In my judgment this personal presidential trust could not be delegated, and the delegation of it to Mr. Polk was not in accord with the statute, and therefore was without warrant of law. But the President's subsequent approval and ratification of what was done under the delegation constituted such personal action by the President as validates the sale. I therefore concur in the conclusion reached.